UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BENNY L. STEWART, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 13 C 7343 ) |
| THEATRICAL STAGE EMPLOYEES UNION LOCAL NO. 2 | ) Judge Rebecca R. Pallmeyer ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff Benny L. Stewart is a staging technician and was a member of the Theatrical Stage Employees Union Local No. 2 ("Union") from 2007 to 2013. In this suit, Stewart—who is 60 years old and African American—alleges that the Union failed to represent him in a September 2011 wage grievance and later failed to adequately respond to harassment of Stewart by another Union member. In both instances, Stewart claims that the Union's actions were based on his race and intended as retaliation for an earlier grievance against the Union that Steward had filed with the Illinois Department of Human Rights ("IDHR"). At the motion-to-dismiss stage, the parties agreed that Plaintiff's claims arose under Title VII, and discovery proceeded on that basis. On September 28, 2015, the court struck Defendant's motion for summary judgment, which had been fully briefed by the parties. The court noted its concern that Plaintiff's claims, which he filed pro se, may have been more appropriately labeled as violations of the duty of fair representation under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, or as interference with Plaintiff's right to contract in violation of 42 U.S.C.§ 1981. The Union (1) moves for reconsideration [77] of that order, arguing that the court "went beyond the adversarial issues presented to the court by the parties"; and (2) asks the court to grant the Union's motion for summary judgment [41]. For the reasons set forth below, both motions are granted.

**BACKGROUND**

**I.     Factual history**

In February 2011, Stewart filed a charge of discrimination with the IDHR against the Union, alleging, among other things, that he had been given "unequal job assignments" because of his race. (*Stewart v. Theatrical Stage Employees Union*, Compl., No. 13 C 538, Ex. 1 to Def.'s Mot. to Reconsider [78].) That charge led to an earlier lawsuit filed in this court, which Judge James Zagel dismissed in 2013 due to Stewart's failure to comply with a court order.[1] This suit arises from another charge of discrimination Stewart filed against the Union in March 2012. (Charge of Discrimination, Compl. at 10.) Plaintiff cross-filed this charge with the IDHR and the Equal Employment Opportunity Commission. The EEOC investigated Stewart's claim and issued a right-to-sue letter in July 2013 (EEOC Notice of Rights, Compl. at 18.) Plaintiff filed this suit three months later. In it, Plaintiff alleges that, because of Stewart's race, the Union failed to promote him, "refused to provide a fair duty of representation," and failed to stop harassment against him. (Compl. at 4.) Stewart also claims that the Union retaliated against him for his February 2011 IDHR charge. (*Id.*) These claims involve two underlying incidents: (1) a September 2011 wage grievance in which the Union purportedly failed to represent Plaintiff; and (2) harassment by Union member Mike Yeager in October 2011.

**A.     September 2011 wage grievance**

The Union refers its members to employers in the Chicago theatre industry for various short-term employment opportunities. (Pl.'s Resp. to Def.'s R. 56.1 Statement [57], hereinafter "Pl.'s 56.1 Resp.," ¶ 7.) Some of these employers pay Union members directly, while others mail checks to the Union, which then forwards the checks to its members. (*Id.* ¶¶ 10, 11.) On September 29, 2011, Plaintiff wrote a letter to Union secretary Tom Cleary, inquiring about missing checks from three shows he worked in the summer of that year. (Stewart Dep., Ex. 1 to

---

[1] Although Defendant had not yet filed an answer in that case, the dismissal for failure to comply with a court order operates as an adjudication on the merits. *See* FED. R. CIV. P. 41(b).

Def.'s Mot. for S.J. [45-1] at 21.) The checks were for work Stewart performed at (1) a July 2011 Goo Goo Dolls concert; (2) an August 2011 production of Beauty and the Beast, produced by Broadway in Chicago; and (3) an August 2011 Paul McCartney Concert at Wrigley Field. (*Id.* at 22, 23, 29.) With respect to the first two checks, the dispute was quickly resolved. Sometime after sending his letter, Plaintiff realized on his own that he had already received payment for the Goo Goo Dolls concert. (*Id.* at 25-26, 28 ("[I]t would be safe to assume by [Nov. 28, 2011, when Stewart wrote another letter to the Union,] that the Goo Goo Doll check had been resolved.").) He was "confused" and did not recognize that he had been paid for the event because the relevant check included additional funds from another job. (*Id.* at 24.) As for the Beauty and the Beast show, Stewart contacted[2] Broadway in Chicago directly, and the company re-issued Stewart's paycheck in October 2011. (*Id.* at 23.)

The missing check from the Paul McCartney concert proved more of a challenge. Program Production, Stewart's employer for that show, is one of the of the employers whose practice is to send checks for stagehands directly to the Union. (*Id.* at 30.) On September 15, 2011, Stewart called the Union to ask about the McCartney check and spoke with Maria Flores, the office administrator. (*Id.* at 30-31.) She told Plaintiff to "give it time." (*Id.* at 30.) Stewart called the Union again to discuss the check "around the end of September." (*Id.* at 31.) On this call, Maria informed Plaintiff that the Union had determined that someone had endorsed the check with Stewart's name and cashed it. When Stewart told Maria that he had never received the check, she mailed him a photocopy of the endorsed check. (*Id.* at 43.) At this point, Stewart realized "that there had been a forgery." (*Id.* at 33.) On October 18, 2011, Stewart wrote a letter to Ralph Hicks, the payroll manager at Program Productions, asking Hicks to file a fraud complaint with the company's bank and reissue the check to Stewart. (*Id.* at 42.) On some later date, Plaintiff spoke with Hicks on the phone. Hicks suggested that Stewart directly contact the

---

[2] The record does not indicate how Plaintiff communicated with Broadway in Chicago.

banks involved, and Plaintiff took this advice. On unidentified dates, he contacted Fifth Third Bank (the bank that issued the check), Citibank (the bank that cashed the check), and Bank of America (the bank where the check inexplicably "ultimately ended up"). But none of the financial institutions would give him any information. (*Id.* at 44.) Instead, each bank told Stewart that Program Productions would have to file a fraud complaint on Stewart's behalf. (*Id.*) Plaintiff filed a police report related to the missing check and repeatedly asked Program Productions to file a fraud complaint with the banks, but the company never reissued the check and never filed a complaint. (*Id.*) Finally, on July 26, 2012, Plaintiff filed suit against Program Productions in small claims court. The court awarded him $1,194.28—the amount of the missing paycheck—plus court costs on September 6, 2012. (*Id.* at 45.)

Apart from telling Stewart that his check and been cashed and then sending him a copy of the cashed check, the Union took no action on Stewart's dispute with Program Productions. (Stewart Dep. at 49.) The Union never responded to Plaintiff's September 28, 2011 letter, and only "vaguely responded" to his inquiries on the phone. (*Id.* at 51.) Stewart is not aware of any other Union member's having a problem with his or her paycheck from the August 2011 McCartney concert. He has also "never heard anyone say that [the Union] ignored them or their inquiries about finances." (*Id.* at 51-52.) Nor has he ever heard of any other employee having to deal with a "[m]issing, forged[, or] disappearing paychecks." (*Id.* at 52.) In previous incidents, however, some paychecks were delayed because employers were late to submit payments. On those occasions, Stewart also reached out to the Union and had "no problem getting information." (*Id.* at 54.)

**B.     October 2011 harassment**

Stewart worked at a show at Harris Theatre on October 16, 2011. Approximately thirty minutes before he was scheduled to start working, Plaintiff was relaxing backstage and reading a newspaper when another Union member, Mike Yeager, approached him. Yeager told Stewart that he "ought to stop suing the Union because you're just a nigger." (*Id.* at 58.) Plaintiff

4

immediately walked away from Yeager and reported the incident to another Union member, Don Dome. (*Id.* at 61.) Dome directed Stewart to speak with Andy Principe, the Union steward at the Harris Theatre. (*Id.*) Plaintiff told Principe that he would fulfill his commitment to work that evening, but that he did not want to have any contact with Yeager. Principe honored this request, and kept Yeager and Stewart separated. (*Id.* at 61-62.) Neither Yeager nor any other Union member or official has ever made other harassing statements to Stewart. (*Id.* at 64, 78-79.)

Five days later, on October 21, 2011, Stewart filed an internal grievance against Yeager with the Union. (*Id.* at 68.) Plaintiff claims that he requested representation from the Union in pursuing his claim against Yeager, but the Union ignored that request. (*Id.* at 73.) He does not indicate when he made that request, however, and his October 21, 2011 does not include any request for representation. (Ex. 7 to Def.'s Mot. for SJ [45-7].) According to Craig Carlson, the Defendant's business manager, the Union assigned one of its attorneys, Sherrie Voyles, to conduct an investigation into Stewart's allegations against Yeager. (Carlson Decl. Ex. 12 to Def.'s Mot. for SJ [45-12], ¶ 3.) Voyles attempted to interview Stewart on the phone on an unidentified date, but Plaintiff "told her that [he] had submitted [his] certified statement to the hall, [and] there was nothing else to be said." (Stewart Dep. at 72.) Voyles also reached out to Yeager, who acknowledged "that he did tell Stewart he was an asshole for suing the Union, but claimed that he never used the n word." (Voyles Decl., Ex. 14 to Def.'s Mot. for SJ [45-14], ¶ 3.) In addition to Yeager, Voyles interviewed seven other individuals who were at the Harris Theatre on October 16, 2011. (Voyles's Investigation Report, Ex. 10 to Def.'s Mot. for SJ [45-10].) Each denied hearing Yeager make a racially derogatory remark. (Voyles Decl. ¶ 4.) Notably, the list of members interviewed by Voyles does not overlap with the list of purported witnesses identified by Stewart in his October 21, 2011 charge. Nor does the list in the charge match up with the list of witnesses that Stewart has pointed to in this litigation. At his deposition, Stewart testified that Union member Kevin Engstrom "was to [Stewart's] left" when

5

Yeager allegedly called him "nigger." (Stewart Dep. at 60.) In his Rule 56 statement of additional facts, Stewart claims, for the first time, that Jeffery Kern and Ross Wilkerson were also present when Yeager harassed him. None of these three men were listed in Stewart's letter to the Union, however, and Plaintiff offers no evidentiary support for his claims regarding Kern and Wilkerson, so the court will not consider this purported fact in its analysis.

Voyles closed her investigation on December 5, 2011, finding insufficient evidence to conclude that Yeager either did or did not make the derogatory statement. (Voyles Decl. ¶ 4.) She recommended that the Union publish the following notice to its members:

> Stagehands Local is committed to providing a workplace in which all individuals are treated with respect and dignity. Each individual has the right to work in an environment free of discrimination and harassment on the basis of any legally protected status. No person, regardless [of] whether it is a business agent or member, should be required to endure discriminatory treatment or sexual harassment or work in a hostile environment as a condition of employment. Local 2 strongly encourages all members and stagehands to treat coworkers, members, and employers and management with respect and to create a work environment and atmosphere that embraces all the diversity of our Union.

(Voyles's Investigation Report at 4.) On that same day, Stewart appeared before the Union's executive board regarding his allegation against Yeager. (Carlson Decl. ¶ 4.) The board informed Stewart that Voyles had been unable to prove or disprove his charge. (Stewart Dep. at 71-72.) The Union contends that it never provides representation to any member who files charges against another member. (Carlson Decl. ¶ 5.) In his response to Defendant's Rule 56 statement of facts, Plaintiff denied the Union's assertion that non-representation was standard Union policy in these circumstances, but he failed to elaborate beyond the word "denied," and again offered no evidence to rebut the Union's statement. (Pl.'s Resp. to Def.'s R. 56 ¶ 63.) And at his deposition, Stewart acknowledged that he is unaware of any member who has requested or received representation in a similar case. (Stewart Dep. at 73-74.) On December 14, 2011, the Union published to its members the notice recommended by Voyles. (Ex. 11 to Def.'s Mot. for SJ [45-11].)

6

**II.      Procedural history**

Stewart filed this suit in October 2013, attaching to his complaint the charge of discrimination he had filed with the IDHR and EEOC the previous year. The charge, No. 2012CA2794, refers to the two incidents discussed above from September and October 2011. Stewart's complaint in this case, however, included numerous allegations beyond the scope of the charge. For instance, the complaint reiterated claims, previous dismissed in the case before Judge Zagel, that the Union provided unequal work assignments on the basis of Plaintiff's race. Defendant filed a partial motion to dismiss, seeking to confine the scope of this suit to those claims identified in charge No. 2012CA2794. (Def.'s Mot. to Dismiss [12].) Stewart responded that that he was "only seeking relief for 2012CA2794 incidents." (Pl.'s Resp. to Def.'s Mot. to Dismiss [19] at 1.) Plaintiff reiterated this sentiment in court on March 25, 2014:

> THE COURT: My – my understanding is the claims that are before me are the Title VII claims involving a failure to acknowledge a grievance on September 30th of 2011, use of the N word by another union member. Those are the claims I've got before me.
>
> STEWART:    Yes.

(March 25, 2014 Tr. at 9.)

The court subsequently granted in part Defendant's motion, stating that

> Plaintiff's claims in this lawsuit arise out of EEOC Charge No. 2012 CA 2794, and are: (1) that Defendant Union failed to represent him in a wage grievance on September 30, 2011; and (2) that a fellow Union member harassed him on October 16, 2011, by using the "n word" in telling Plaintiff he should to "stop suing the Union." . . . Other allegations set forth in Plaintiff's pro se complaint may provide context for those claims, but Plaintiff agrees that they do not set forth independent claims for relief from this court.

[24].

The parties returned to court on July 15, 2014 to resolve a discovery dispute. During that hearing, Stewart again acknowledged that his claims were confined to the two episodes mentioned in charge No. 2012CA2794. (July 15, 2014 Tr. at 2.)

Defendant moved [41] for summary judgment on October 31, 2014. That motion was

7

fully briefed as of February 9, 2015. The court held a hearing on the motion on September 28, 2015 and expressed its concern that Plaintiff's pro se status may have led to a mislabeling of his claims as arising under Title VII. (Sept. 28, 2015 Tr. at 3.) The court suggested that, because Defendant never employed Plaintiff, his claims might have been more appropriately raised as either a violation of the duty of fair representation under § 301 of the LMRA or as a case of interference with contractual rights under 42 U.S.C. § 1981. (*Id.*) Based on these concerns, and the fact that the parties had not yet weighed in on them, the court struck Defendant's motion and directed the parties to proceed to a settlement conference before the assigned magistrate judge.

Settlement efforts did not bear fruit, however, and Defendant filed a motion to reconsider [77]. In it, Defendant argues that the court's order to strike "went beyond the adversarial issues presented to the court" and was based on the court's "misapprehension" of the issues presented. (Def.'s Mem. in Support of Mot. to Reconsider [78] at 8-14.) Defendant urges the court to reconsider its order to strike and grant summary judgment in the Union's favor.

## ANALYSIS

**I.     Motion to reconsider**

A motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (internal quotation marks and citation omitted). The court will, however, grant a motion to reconsider when it "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). Defendant asks the court to reconsider its September 28, 2015 ruling because, it urges, the court's decision (1) went beyond the issues presented by

8

the parties, and (2) relied on an error of apprehension.

Defendant argues that, prior to the court's September 28, 2015 ruling, "there had been no dispute as to the adversarial issues presented to the court by the parties." (Def.'s Mem. in Support of Mot. to Reconsider [78], hereinafter "Def.'s Reconsideration Mem.," at 9.) More specifically, the Union argues, no one had previously questioned the fact that Plaintiff's claims arose under Title VII. The court acknowledges that the parties have consistently agreed that Plaintiff's claims in this suit stem from the incidents alleged in charge No. 2012CA2794. It is also true that Plaintiff filed his charge with the EEOC, which administers Title VII. But Defendant conflates two separate but related issues. In issuing its September 28, 2015 ruling, the court was not concerned with whether Plaintiff had claims beyond those related to the incidents spelled out in his EEOC charge. What motivated the court to strike Defendant's motion was the fear that the incidents in the EEOC charge would have been more appropriately labeled as claims under a statute other than Title VII, such as § 301 of the LMRA or § 1981. This fear was borne out of the "well-established duty of the trial court to ensure that the claims of a pro se litigant are given a fair and meaningful consideration." *Donald v. Cook Cty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996) (quoting *Palmer v. City of Decatur*, 814 F.2d 426, 428-29 (7th Cir. 1987)). The court also questioned the applicability of Title VII here, given that Defendant was not Plaintiff's employer. (Sept. 28, 2015 Tr. at 4.)

Upon further consideration, however, the court is persuaded that Plaintiff's claims were properly dismissed, regardless how they are characterized. The court's concerns were based on the belief that, had Plaintiff labeled his claims differently, the court's summary judgment analysis might have differed materially. But the court is satisfied that this is not the case. First, to the extent that Plaintiff's allegations could support a claim for breach of the duty of fair representation under § 301, any such claim would be barred by the six-month statute of limitations applicable to such claims. *See Ranieri v. United Transp. Union*, 743 F.2d 598, 600 (7th Cir. 1984) (affirming dismissal of claim for breach of duty of fair representation as time-

9

barred by the six-month statute of limitations under the National Labor Relations Act). Stewart filed his complaint here in October 2013, nearly two years after the underlying incidents occurred. Although he filed his EEOC charge within the six-month window, "the time for filing a section 301/fair representation claim is not tolled by pursuing a Title VII claim with the EEOC." *Fuqua v. United States Postal Service*, 979 F. Supp. 2d 850, 857-58 (N.D. Ill. 2013) (quoting *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 550 (7th Cir. 1987)).

Casting his suit as a 42 U.S.C. § 1981 case, on the other hand, would have had no material impact on the court's summary judgment analysis. Title VII claims and § 1981 claims are analyzed under the same standards. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 n.2 (7th Cir. 2014) ("Plaintiffs technically bring their discrimination and retaliation claims under both Title VII and 42 U.S.C. § 1981. We analyze both claims under Title VII because the analysis for these two claims is generally the same under either statute.") (citing *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007)); *see also Stahly v. Amalgamated Transit Union, Local* 996, 3 F. Supp. 3d 720, 729 (N.D. Ind. 2014) ("The standards for proving a Title VII violation are essentially the same as a Section 1981 violation.")

Finally, in carrying out that analysis, the Seventh Circuit has erased any distinction between a defendant-union and a defendant-employer under Title VII. Until recently, a worker seeking to establish a prima facie case of discrimination against her union was required to show that (1) the employer violated the collective bargaining agreement between the union and the employer; (2) the union breached its own duty of fair representation by letting the breach go unrepaired; and (3) evidence indicated animus against a protected class motivated the union. *See Greenslade v. Chicago Sun-Times*, 112 F.3d 853, 866 (7th Cir. 1997). But in *Green v. AFT/ITF Local 604*, 740 F.3d 1104, 1106 (7th Cir. 2014), the Court of Appeals held that "nothing in the text or genesis of Title VII suggests that claims against labor organizations should be treated differently" than claims against employers. Under *Green*, discrimination claims against labor unions "must be evaluated under a straight Title VII analysis." *Stahly*, 3 F. Supp. 3d at

729 (citing *Green*, 740 F.3d at 1107). Thus, to prove his claim of discrimination against the Union, Stewart must present evidence that the Union took action against him for a discriminatory reason.

The court is satisfied that each of the concerns animating its decision to strike Defendant's motion for summary judgment was unwarranted. The court therefore grants the Union's motion for reconsideration [77] and turns to the merits of Defendant's motion for summary judgment.

## II. Motion for summary judgment

### A. Legal standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P 56(c)(2). When ruling on a summary judgment motion, the court credits all admissible evidence presented by the nonmoving party and draws all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court does not assess the credibility of witnesses or weigh evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), and will not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Still, "once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(e)). No genuine issue exists "if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find [for the opposing party]." *Anderson*, 477 U.S. at 254.

In *Ortiz v. Werner Enter. Inc.*, __ F.3d __, 2016 WL 4411434 (7th Cir. Aug. 19, 2016),

the Seventh Circuit removed the direct versus indirect evidence distinction from our employment discrimination analysis. Now, courts in this circuit must consider "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." 2016 WL 4411434, at *9. The Court of Appeals instructed district courts to "stop separating 'direct' from 'indirect' evidence" and instead focus on the "sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would [not have suffered the adverse employment action] if he had a different ethnicity, and everything else had remained the same." *Id.* at *6. The parties' briefs predate *Ortiz* and rely on the direct/indirect distinction, but the court's analysis remains largely unchanged.

### B. *September 2011 wage grievance*

Stewart claims that the Union declined to represent him with regard to the missing checks in retaliation for his previous grievance against Defendant.[3] But he does not offer any evidence that directly supports his claim. Nor does the evidence here support the conclusion that race or retaliation caused Plaintiff to suffer an adverse employment action.

Although Stewart, an African American, is a member of a protected class, the record is devoid of evidence that any similarly situated Union members outside of that class were treated more favorably than him. In fact, Stewart testified at his deposition that he is not aware of any other employee who had a check stolen by a third party. (Stewart Dep. at 52.)

But even if Plaintiff could identify comparators who received preferential treatment, the Union did not subject Plaintiff to any adverse employment action.[4] *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (holding that, although "[t]he definition of an adverse

---

[3] Stewart "ha[s] no idea" who stole the check, and does not allege that the Union is at fault for its theft. (Stewart Dep. at 49.)

[4] The Union contends that Plaintiff has also fails to establish the second element of a discrimination claim under the indirect method: that he adequately performed his job. (Def.'s Mem. in Support of S.J. at 10.) For support, Defendant points to several issues, including that Plaintiff paid his Union dues late on several occasions during his years in the Union. But, despite this evidence, the record does not support the conclusion that, as a matter of law, Plaintiff failed to reasonably perform his job.

12

employment action is generous, . . . it is still subject to certain limitations. At the very least, [a plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus*., 325 F.3d 892, 901 (7th Cir. 2003).

The definition of a "materially adverse action" differs for cases alleging employment discrimination versus those alleging retaliation. In the retaliation context, "adverse employment action" simply means an employer's action that would dissuade a reasonable worker from participating in protected activity. *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014). Employees who bring a claim of discrimination face a heavier burden: an "adverse employment action" in those cases must visit upon a plaintiff a significant change in employment status, and often involves the employee's current wealth, her career prospects, working conditions, etc. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014); *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007).

Plaintiff fails to meet either standard. As Defendant is quick to point out, Plaintiff's difficulties with each check were resolved in his favor. At worst, Defendant failed to represent Stewart in his attempt to recover stolen funds. The court need not decide whether such a failure could conceivably support a claim that the Defendant failed in its duty to represent Stewart under § 301 of the LMRA. The alleged failure does not sustain a Title VII claim. *See Lewis v. Tyson Foods, Inc.*, No. 3:11 CV 442, 2013 WL 5852659, at *10 (N.D. Ind. Oct. 29, 2013) (collecting cases in which courts found that an employer's delay in investigating an employee's complaint did not constitute adverse employment actions). As noted, Plaintiff is now time-barred from raising any § 301 claims related to the incidents underlying this case.

Defendant's motion for summary judgment is granted as it relates to Plaintiff's claims regarding his missing checks from September 2011.

### C. October 2011 harassment

Finally, the court turns to Stewart's Title VII claim stemming from Yeager's alleged

harassment of Plaintiff in October 2011. Defendant seeks summary judgment on this claim, as well, arguing that (1) the Union is not liable for the conduct of its members such as Yeager, (2) the Union fulfilled any obligation it had by taking appropriate corrective action, and (3) a one-off racial epithet is insufficient to trigger liability.

As an initial matter, the court notes that Plaintiff's claim is most appropriately viewed as a Title VII hostile work environment claim.[5] Unlike an employment discrimination or retaliation claim, either of which requires that a plaintiff suffer an adverse employment action, to survive summary judgment on a racially hostile work environment claim, an employee must provide sufficient evidence that demonstrates: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

Defendant argues that Stewart cannot establish the final element: i.e., that there is no basis for the Union's liability. Generally speaking, a union is not liable for the discriminatory actions of its members: "Title VII makes both employers and unions liable for their own conduct, not that of employees or members. Thus when line employees engage in discrimination, employers are not automatically liable; only if they know (or ought to know) what is going on and choose to do nothing . . . are they liable." *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 653 (7th Cir. 2006). There is no evidence that the Union knew about Yeager's statement before he made it.[6]

---

[5] Stewart takes issue with the fact that the Union failed to represent him in his grievance against Yeager. But, as noted above, Plaintiff is time-barred from raising a claim under § 301 of the LMRA. Furthermore, the record establishes that it was Union policy not to represent members in claims against one another.

[6] In his response to Defendant's motion for summary judgment, Plaintiff claims that "[it] has been brought to [his] attention by a fellow member that Craig Carlson had advised members . . . that they heard nothing prior to investigation by Ms. Sherri Voyles." (Pl.'s Resp. to Mot. [59] at 4.) But he offers no evidence to support that assertion.

The Union may be held liable for Yeager's purported actions, however, if it failed to take appropriate remedial action after learning about them. "Once aware of workplace harassment, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011). The Seventh Circuit has "recognize[d] prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005).

The Union did initiate an investigation promptly in this case, which led to an inclusive workplace notice being distributed among Union members via letter. The investigation was arguably not a perfect one: there were apparently no consequences for Yeager, who by his own admission called Plaintiff an "asshole" in retaliation for Stewart's filing of a grievance against the Union. And Voyles may have left some stones unturned. Plaintiff asserts that Voyles failed to interview all of the witnesses he named in his letter to the Union on October 21, 2011. (Pl.'s S.J. Resp. at 4.) In its reply, the Union contends that Voyles did all she could, given that Stewart "refused to participate in the Union's investigation." (Def.'s S.J. Reply at 5.) Indeed, Stewart did not accept Voyles's interview invitation, but he did meet with the executive board, and his letter to the Union listed the witnesses he now complains that Voyles did not contact.[7] The Union offers no explanation for this shortcoming. Taken in the light most favorable to Stewart, Voyles's unexplained failure to interview certain witnesses (or even mention them in her report) could creates a genuine issue as to whether Defendant adequately responded to Yeager's purported harassment of Stewart. *See Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990) (the effectiveness of a defendant's corrective action is a

---

[7] The Union points out that Plaintiff's October 21 letter does not list the three names that Stewart identifies in his statement of additional facts as witnesses not interviewed by Voyles: Kevin Engstrom, Jeffery Kern, and Ross Wilkerson. (Def.'s SJ Reply at 5.) But this fact is hardly damning. First, these men could have been among the "approximately five other crew members" that the October 21 letter identified as witnesses. More importantly, this discrepancy has no impact on the fact that Voyles failed to interview three individuals identified by name as witnesses in the letter.

question of fact).

But this does not end the court's analysis. Summary judgment for Defendant may still be appropriate if, as the Union contends, Plaintiff cannot establish the remaining elements of a hostile work environment claim. The Union specifically argues that the conduct Stewart alleges was neither "severe or pervasive" as the Seventh Circuit has defined those terms. (Def.'s SJ Reply at 6.)

In determining whether harassing conduct is sufficiently severe or pervasive to be actionable under Title VII, courts look at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim. *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (citation and quotation omitted). Although Yeager's purported statement was reprehensible and undeniably race-based, it was not severe enough to create a hostile work environment in this circuit. The Court of Appeals has held that "the one-time use of a racial epithet is not severe enough to trigger liability." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2015).

Stewart can therefore succeed in proving "severe or pervasive" conduct existed only "if the totality of the collection of allegedly harassing incidents triggers liability." *Id.* But Stewart acknowledged that neither Yeager nor any other Union member has made similar comments to him before or after October 16, 2011. (Stewart Dep. at 64, 78.) Yeager denies having used the slur, and the Union promptly issued a corrective notice. This record reflects a disturbing but isolated incident, not "severe or pervasive conduct." Plaintiff therefore cannot establish a hostile work environment claim. Defendant's motion for summary judgment is granted as to Plaintiff's

claim arising out of the October 16 incident with Yeager.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to reconsider [77] and its motion for summary judgment [41] are both granted.

ENTER:

Dated: September 29, 2016

_____
REBECCA R. PALLMEYER
United States District Judge